Phyllis WOLBERS, Executor of the Estate of Samuel Wolbers, Deceased, and Phyllis Wolbers, Individually, Appellee,

v.

THE FINLEY HOSPITAL, an Iowa Nonprofit Corporation, Appellant.

No. 02–1041.

Supreme Court of Iowa.

Dec. 17, 2003.

Rehearing Denied Jan. 21, 2004.

David L. Hammer, Angela C. Simon, and Scott J. Nelson of Hammer, Simon & Jensen, Dubuque, for appellant.

Mark E. Liabo of Tom Riley Law Firm, P.C., Cedar Rapids, and Leslie M. Blair III of Blair & Fitzsimmons, Dubuque, for appellee.

CARTER, Justice.

The Finley Hospital (the hospital) appeals from a judgment on a jury verdict in favor of Phyllis Wolbers, the personal representative of Samuel Wolbers, deceased. At least ten assignments of error are presented for our review. We separately consider each one and, except for a modification of the interest on the judgment, find no basis for reversing the judgment of the district court.

Plaintiff's decedent, Samuel Wolbers, sought medical attention from Dr. Joseph Jenkins of Dubuque Surgery, P.C. on May 5, 1997. After assessing Mr. Wolbers' medical condition, Dr. Jenkins scheduled him for a surgical procedure called a carotid endarterectomy on May 16, 1997. Wolbers was admitted into the hospital operated by defendant hospital on May 15, 1997, in preparation for the surgical procedure.

Wolbers, who was a heavy smoker, was instructed to discontinue all smoking prior to the surgery. In defiance of those instructions, he continued smoking up until the time he entered the hospital. On May 16, Dr. Jenkins performed the carotid endarterectomy as planned. While Wolbers was recovering from the procedure, he had a small stroke. Dr. Jenkins performed a second surgical procedure on him in response to the stroke. He was then moved to intensive care for recovery.

After being transferred to a regular nursing unit on May 18, he began experiencing difficulties breathing. He notified nursing and respiratory therapy staff of the problem. His complaints were documented in his hospital chart and called to the attention of Dr. Webb, an emergency-room physician employed by the hospital. The code blue chart noted that he was bluish in color, indicating a lack of oxygen in his blood. Dr. Webb attempted to open Wolbers' air passages by intubation, but was unsuccessful because of the extent of the blockage. The emergency-room staff also utilized an Ambu bag to increase oxygen intake. Dr. Webb did not seek surgical intervention to alleviate the problem. The hospital staff failed to notify Dr. Jenkins of Wolbers' respiratory difficulties until the early morning hours of May 19. After various attempts to remedy his breathing complications, Wolbers died on May 19, 1997.

Plaintiff, individually and as executor of the estate of her deceased husband, filed an action for wrongful death against the hospital. She later filed a motion to amend the petition to add a claim for lost chance of survival on May 23, 2000. On May 17, 2002, the jury returned a verdict in favor of plaintiff for damages totaling $364,000. Additional facts will be discussed below as relevant.

I. *Whether the District Court Erred in Failing to Instruct the Jury on the Issue of Comparative Fault.*

The hospital asserts that, because there was substantial evidence presented to support a finding of causal fault attributable to plaintiff's decedent, the issue of comparative fault was erroneously withheld from the jury. We review issues concerning the failure to submit a comparative-fault defense for correction of errors at law. *DeMoss v. Hamilton,* 644 N.W.2d 302, 305 (Iowa 2002).

Parties are entitled to have their legal theories submitted to the jury when

the instructions expressing those theories correctly state the law, have application to the case, and are not otherwise covered in other instructions. *Vasconez v. Mills,* 651 N.W.2d 48, 52 (Iowa 2002). Proposed instructions must be supported by the pleadings and substantial evidence in the record. *Id.* Evidence is substantial if a reasonable person would accept it as adequate to reach a conclusion. *Id.*

We addressed the applicability of comparative negligence in wrongful-death cases in *DeMoss,* 644 N.W.2d at 305–07. We concluded that in order for comparative negligence to be applicable in a medical malpractice action:

> [A] patient's negligence must have been an active and efficient contributing cause of the injury, must have cooperated with the negligence of the malpractitioner, must have entered into proximate causation of the injury, and must have been an element in the transaction on which the malpractice is based. Accordingly, in a medical malpractice action, the defense of contributory negligence is inapplicable when a patient's conduct provides the occasion for medical attention, care, or treatment which later is the subject of a medical malpractice claim or when the patient's conduct contributes to an illness or condition for which the patient seeks the medical attention, care or treatment on which a subsequent medical malpractice claim is based.

*Id.* at 306.

In *Fritts v. McKinne,* 934 P.2d 371 (Okla.Ct.App.1996), a case relied on in *DeMoss,* the patient had been seriously injured in a single-car accident, and all of his major facial bones had been broken. *Fritts,* 934 P.2d at 372. Five days after the accident, an oral surgeon was scheduled to perform facial repairs, and the defendant doctor was to assist by perform-

ing a tracheostomy. *Id.* The doctor cut or ruptured the innominate artery during the tracheostomy. *Id.* The patient lost a large amount of blood, failed to regain consciousness, and died three days later. *Id.* at 373.

The doctor in *Fritts* argued that the patient's innominate artery was found up in his neck area, when normally it should have been in his chest, complicating the procedure. *Id.* The doctor further argued that the patient was injured while driving drunk or while riding in a vehicle driven by another intoxicated person. *Id.* The appellate court held that a comparative-fault instruction was not warranted. *Id.* at 374. The court stated:

> Those patients who may have negligently injured themselves are nevertheless entitled to subsequent non-negligent medical treatment and to an undiminished recovery if such subsequent non-negligent treatment is not afforded.

*Id.* (citing *Martin v. Reed,* 200 Ga.App. 775, 409 S.E.2d 874, 877 (1991)).

We also discussed several other cases in *DeMoss* in which a patient's "negligence" was not relevant to later medical malpractice claims. These include: *Matthews v. Williford,* 318 So.2d 480, 483 (Fla.Dist.Ct. App.1975) (patient's failure to follow advice to quit smoking following heart attack ten years earlier too remote to support comparative-fault instruction); *Van Vacter v. Hierholzer,* 865 S.W.2d 355, 360 (Mo.Ct. App.1993) (reversal warranted when comparative-fault instruction invited jury to apportion fault based on conduct not proximately causing death); *Jensen v. Archbishop Bergan Mercy Hosp.,* 236 Neb. 1, 459 N.W.2d 178, 186–87 (1990) (patient's failure to heed doctor's advice to lose weight may have caused pulmonary embolism but is irrelevant to the claim that doctor later negligently treated the condition); and *Gravitt v. Ward,* 258 Va. 330, 518 S.E.2d 631, 635 (1999) (insufficient

proof of patient's failure to notify doctor of breast lump to warrant comparative-fault instruction).

In the present case, the hospital contends that Wolbers' history of tobacco use, even up to the date of his admission into the hospital, was a producing cause of his death because it contributed to the blockage of his air passages. While it seems clear that smoking can produce increased secretions, such as the ones that caused a blockage to the airways of plaintiff's decedent, it seems equally clear that the present claim was based on the hospital staff's alleged failure to adequately treat the condition that existed, whatever its cause. Under the court's instructions, the jury was required to so find in order to allow recovery. Thus, this case is analogous to cases cited in *DeMoss* in which the patient's negligence created a condition that a physician negligently failed to treat at a later time. The district court correctly declined to give a jury instruction on comparative negligence.

## II. *Whether the District Court Properly Submitted the Issue of Vicarious Liability to the Jury.*

■ The hospital asserts it could not be liable under the theory of vicarious liability, as it is prohibited by law from practicing medicine. It further asserts that, while a corporation is responsible for the acts of its employees, it cannot be liable, nor did it have the right, to direct or control the manner in which its employee doctor practiced medicine.

Dr. Webb was an employee of Finley Hospital at the time he treated Mr. Wolbers. Under the terms of his employment agreement, he agreed to follow the guidelines for performance of the duties of an emergency physician at the hospital and to comply with the medical staff bylaws and rules of procedure. Dr. Webb further ac-knowledged that the hospital had established procedures and guidelines with respect to emergency medicine and that he would perform in conformance with those guidelines. The hospital further retained the right to terminate Dr. Webb's employment if he failed to follow the hospital's guidelines for performance.

■ Ordinarily, a claim of vicarious liability under the doctrine of respondeat superior in an employment situation rests on two elements: proof of an employer/employee relationship and proof that the injury occurred within the scope of that employment. *Biddle v. Sartori Mem'l Hosp.*, 518 N.W.2d 795, 797 (Iowa 1994). Nevertheless, the hospital argues that it cannot be vicariously liable for Dr. Webb's medical judgments because it had no right to control them. It relies on Iowa Code section 147.2 (1999) in support of its argument. That section states in relevant part:

A person shall not engage in the practice of medicine and surgery [or] nursing . . . unless the person has obtained from the department a license for that purpose.

Iowa Code § 147.2.

■ The matter of control as to the details of the work is an important element of a master-servant relationship, *see* Restatement (Second) of Agency § 220(2)(a) (1958) [hereinafter Restatement]. However, the relationship of master and servant is not the only agency status that supports vicarious liability. *See Wiedmeyer v. Equitable Life Assurance Soc'y*, 644 N.W.2d 31, 34 (Iowa 2002) (owner of shopping center who entrusted details of management to management company held vicariously liable for omissions of management company). Other principal and agent situations exist in which the principal may agree not to exercise a right of control and still

maintain an agency relationship. Restatement § 14(a).

We are convinced the hospital's relationship to Dr. Webb was such as to render it vicariously liable for his negligence in carrying out the hospital's emergency-response function. A hospital impliedly holds out to patients seeking care that its emergency-response staff will competently handle emergency situations in the absence of the patient's personal physicians. This situation has been described as follows:

> A hospital has an absolute duty to its emergency-room patients to provide competent medical care, a duty which cannot be delegated. Thus, a hospital may be vicariously liable for the negligence of its emergency-room caregivers, even if they are designated as independent contractors. This liability arises from an ostensible agency, in that an emergency-room patient looks to the hospital for care, and not to the individual physician—the patient goes to the emergency room for services, and accepts those services from whichever physician is assigned his or her case.

40A Am.Jur.2d *Hospitals & Asylums* § 48, at 460 (1999); *see also Stipp v. Kim*, 874 F.Supp. 663, 665 (E.D.Pa.1995) (same); *Simmons v. St. Clair Mem'l Hosp.*, 332 Pa.Super. 444, 481 A.2d 870, 874 (1984) (same). We believe this nondelegable duty extends equally to outpatients entering the hospital emergency room and inpatients relying on emergency response in the absence of their chosen physician. The district court acted properly in allowing the jury to find that the hospital was vicariously liable for the acts of its emergency-room physician.

**III.  *Whether the Hospital Was Entitled to a Directed Verdict on the Issue of Wrongful Death.***

A.  *Standard of review.* The court reviews a challenge to the denial of a motion for a directed verdict for correction of errors at law. *Heinz v. Heinz*, 653 N.W.2d 334, 338 (Iowa 2002). The evidence is considered in the light most favorable to the nonmoving party. *Id.* If there is substantial evidence in the record to support each element of a claim, the motion for directed verdict must be overruled. *Id.* Additionally, if reasonable minds could reach different conclusions based upon the evidence presented, the issue is properly submitted to the jury. *Id.*

B.  *Discussion.* The hospital asserts that it was entitled to a directed verdict on three grounds: (1) the submission of a wrongful-death claim was inconsistent with the district court's refusal to submit a claim for lost chance of survival; (2) the evidence was insufficient to show the hospital did not provide the necessary standard of care; and (3) the evidence was insufficient to show that the hospital's omissions, if any, were a proximate cause of the death of plaintiff's decedent.

1.  *Consequence of denying lost-chance-of-survival claim.* We are convinced the fact that the district court did not submit a claim for lost chance of survival is of no legal consequence in determining whether a wrongful-death claim was properly submitted. Submission of the wrongful-death claim had to be determined on the merits of that claim and the proof of the respective elements of a wrongful-death action. The court's refusal to submit a claim for lost chance of survival, even if inconsistent, would not preclude submission of a claim for wrongful death if the latter claim had support in the evidence.[1]

---

1.  The reason that the district court refused to    submit a claim for lost chance of survival

**2.** *Evidence of breach of the applicable standard of care.* The plaintiff offered the testimony of Dr. Raphael, a trauma surgeon. This witness was asked the following questions:

Q. Now, Doctor let's talk about the emergency response. Do you have an opinion as to whether or not the care that Mr. Wolbers received after he went into respiratory arrest was adequate and complied with the proper standard of medical care? A. Well, my opinion is that the answer to that is no on several counts.

Q. And can you tell us in what ways his emergency room care fell below the standard of care? A. I just felt that the emergency room doctor didn't act like he had the ability to go any further if he once were unable to intubate the patient and in this case because he couldn't see where he was and for whatever reason he wasn't able to move that material out of the way so he could see.... [A]ll you have to do is stick a needle in that neck if that's what you need to do to get some air in there temporarily, so I think there was a lot of deficiency in the management of the patient.

We are satisfied that this evidence was sufficient to allow the jury to find the hospital vicariously liable for the failure of its emergency-room physician to comply with the applicable standard of care.

**3.** *Proximate cause.* On the issue of proximate cause, Dr. Raphael was asked the following question:

Q. I'm asking you for an answer to a reasonable degree of medical certainty, can you testify as to whether or not it was more likely than not that had an airway been successfully established as you would have—as the standard of care

you have required—would Mr. Wolbers have survived? A. Again, it depends how late in the course because there's a point after which brain death intervenes, but had the airway been established and they had a viable patient, I think they could have brought him back yes.

In response to a later question, Dr. Raphael testified:

On the assumption that the people were in place at the time of the arrest and they established an airway, I think without a doubt he would have been survivable, yes.... I would say somewhere in the neighborhood of six minutes, seven minutes, eight minutes, perhaps ten minutes at the outside, you might have brain damage, but you would have a live patient.

We believe that this testimony was sufficient to permit the jury to find that inadequate emergency response by the hospital emergency-room staff was the proximate cause of the death of plaintiff's decedent.

### IV. Whether the District Court Erred in Its Instructions to the Jury.

**A.** *Eggshell plaintiff.* The hospital asserts it was inappropriate for the district court to give an "eggshell plaintiff" instruction in a case involving a claim of medical malpractice. It urges that every patient can be considered to be an "eggshell plaintiff." The instruction of which the hospital complains was as follows:

If the decedent, Samuel Wolbers, had a condition which made him more susceptible to injury than a person in normal health, then the Defendant is responsible for all injuries and damages which are experienced by the decedent proximately caused by Defendant's ac-

appears to be that the alternatives that were supported in the evidence were a more-likely-than-not chance of survival if the jury be-

lieved plaintiff's expert and a zero chance of survival if they believed the hospital's experts.

tions, even though the injuries claimed produce a greater injury than those which might have been experienced by a normal person under the same circumstances.

We believe that the objection lodged to this instruction in the trial court was inadequate to preserve the challenge now being made on appeal. The hospital's objection to this instruction was as follows:

We object to the use of the word normal health. The Court hasn't defined normal health and the point is that the reason for this instruction as urged by the Plaintiff and accepted by the Court is that Mr. Wolbers had a condition which was a consequence of long-term smoking. There's been evidence in this case of that effect. You heard it—heard it as recently as yesterday, your honor, yet one reads these instructions and they're innocent of any suggestion that smoking is an issue in this case and the failure to instruct on that gives grievous harm to the Defendant and I think puts the court in equally grievous error.

The objection appears to have been an attempt to reassert the issue concerning comparative fault, which was disposed of in Division I of this opinion. It was insufficient to preserve the challenges to the instruction that are being made for the first time on appeal.

### B. *Presumptive evidentiary value of death certificate.*

■ 1. *Arguments.* The hospital asserts the cause of Mr. Wolbers' death was an important issue in this case, and it was error for the district court not to instruct the jury that the death certificate was presumptive evidence of the facts contained therein. Plaintiff argues the requested instruction would have been an improper comment on the evidence and a misstatement of the law.

2. *Analysis.* The hospital requested the following jury instruction:

A certified copy of a death certificate by a physician is presumptive evidence of the facts contained in the death certificate.

We conclude that the proffered instruction was properly rejected by the district court. One of the fighting issues in this case was the cause of death. The death certificate stated as cause of death: "Sudden death due to left carotid endarterectomy 5/16/97, due to peripheral vascular disease due to tobacco use." We have recognized that, although Iowa Code section 144.45 makes death certificates presumptive evidence of facts recited, that is limited

to such facts and data as are specific and known, but do not contemplate the perpetuating of hearsay testimony, which is merely conclusions or opinions of the person or persons making them.

*Beardsley v. Ostrander,* 254 Iowa 356, 359, 118 N.W.2d 61, 62–63 (1962) (citing *Morton v. Equitable Life Ins. Co.,* 218 Iowa 846, 853, 254 N.W. 325, 328 (1934)). A jury given only the instruction proffered by the hospital would not be apt to draw the distinction between facts and opinions and might apply the statutory presumption to the cause of death as expressed in the death certificate. For that reason, the instruction was properly refused.

■ C. *Hypothetical questions to an expert.* The hospital argues that the court's instruction regarding hypothetical questions and expert-witness testimony was a misstatement of the law and that it was prejudiced by the instruction. The instruction that has been challenged provided:

An expert witness was asked to assume certain facts were true and to give an opinion based on that assumption. This is called a hypothetical question. If any

fact assumed in the question has not been proved by the evidence, you should decide if that omission affects the value of the opinion.

The hospital contends that the instruction does not truly state the law as established in *Cody v. Toller Drug Co.*, 232 Iowa 475, 480, 5 N.W.2d 824, 827 (1942). *Cody* states the rule as follows:

> [Answers] to hypothetical questions should be *disregarded* if the facts assumed have not been proven and juries are not permitted to pass on the materiality of such facts.

232 Iowa at 480, 5 N.W.2d at 827 (emphasis added). We need not decide whether the instruction given impermissibly deviates from the rule of law established in *Cody*. The hospital does not identify any hypothetical questions in the present case that assumed facts that were not proven. Consequently, we have no basis for concluding that the giving of the instruction was prejudicial even if it was improperly worded.

██ D. *Submission of past loss of function of mind and body as an element of damage.* The hospital urges that loss of function of mind and body was not a proper item of damage because it lacked support in the evidence. We have recognized that this element of damage may be allowed even though the time between a negligent act impeding a patient's bodily functions and the time of death is brief. *Mead v. Adrian*, 670 N.W.2d 174, 179 (Iowa 2003).

Plaintiff's evidence revealed that over the course of several hours her decedent's upper airway became obstructed. Dr. Raphael testified that plaintiff's decedent went into respiratory arrest and died because of an upper airway obstruction. Before he completely lost consciousness, he was gasping for air. We conclude that the jury could have found that, for some time

prior to his death, plaintiff's decedent suffered loss of ability to breath and loss of mental function as he succumbed to the effect of oxygen deprivation. This element of damage was properly submitted to the jury.

## V. *Whether the District Court Erred in Its Computation and Assessment of Interest.*

██ A. *Standard of review.* The court's scope of review on the assessment of damages and interest is for corrections of errors at law. *Chariton Feed & Grain, Inc. v. Harder*, 369 N.W.2d 777, 782 (Iowa 1985).

██ B. *Arguments.* The hospital argues that the interest on all elements of recovery except the $30,000 awarded for loss of function of body and mind and physical and mental pain and suffering should accrue from the date of the judgment, not from the date of the commencement of the action. The hospital also argues that no interest should be awarded on the portion of the damages for interest on burial expenses because that results in "double interest."

The damages awarded, as itemized by the jury's verdict, were as follows:

| | |
|---|---:|
| Loss of value to decedent's estate | $ 10,000 |
| Interest on burial expenses | 2,000 |
| Loss of spousal support | 172,000 |
| Loss of spousal consortium | 150,000 |
| Loss of function of body and mind | 6,000 |
| Physical and mental pain and suffering | 24,000 |

Interest on past damages accrues from the date the lawsuit was filed. Iowa Code § 668.13(1). Interest on damages awarded for future losses begins accruing on the date the judgment is entered. Iowa Code § 668.13(4). We agree with the hospital's contention that the $30,000 awarded for loss of function of body and mind and physical and mental pain and suffering was the only recovery of past damages. The other elements of damage awarded were

all future damages as contemplated by section 668.13(4). The interest allowed on plaintiff's recovery must be separately computed on past and future damages in accordance with our determination.

With respect to the recovery of interest on burial expenses, that element of damage is merged in and becomes part of the aggregate judgment upon which interest is properly allowed under Iowa Code section 668.13. Under that statute, interest accrues on the entire amount of the aggregate judgment, including those components that were items of interest. We have considered all issues presented and conclude that, subject to the correction of the interest award, the judgment of the district court should be affirmed.

**AFFIRMED AS MODIFIED.**

All justices concur except LAVORATO, C.J., and TERNUS and WIGGINS, JJ., who take no part.