# IN THE COURT OF APPEALS OF IOWA

No. 4-046 / 13-0633
Filed November 13, 2014

**SHERRIE RAENELL COLBERT,**
        Plaintiff-Appellant,

**vs.**

**STATE OF IOWA, DEPARTMENT
OF HUMAN SERVICES-BUREAU
OF REFUGEE SERVICES,**
        Defendant-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Robert J. Blink, Judge.

Sherrie Raenell Colbert appeals the district court ruling granting the State's motion for judgment notwithstanding the verdict. **AFFIRMED.**

Thomas A. Newkirk and Bryan P. O'Neill of Newkirk Law Firm, P.L.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Tyler M. Smith and Barbara E.B. Galloway, Assistant Attorneys General, for appellee.

Heard by Vaitheswaran, P.J., and Tabor and Bower, JJ.

**BOWER, J.**

Sherrie Raenell Colbert appeals the district court ruling granting the State's motion for judgment notwithstanding the verdict on her retaliation claim. Colbert claims the district court erred by finding a physical altercation and other workplace incidents did not qualify as adverse employment actions. We determine the Iowa Civil Rights Commission complaint, and the petition in this action, assert a series of discriminatory events during Colbert's employment with the State in addition to a discrete act on April 9, 2010. The petition makes clear the events alleged to have occurred before April 9, 2010, were pled to support a hostile work environment claim, while the April 9, 2010 incident was pled as a discrete act of retaliation. We find Colbert failed to preserve error for any acts other than the April 9 incident. Even if Colbert preserved error, the complained of acts do not rise to the level of "adverse employment action" for the purpose of her retaliation claim. Therefore, we affirm the district court's ruling on the State's motion for judgment notwithstanding the verdict.

## I.    BACKGROUND FACTS AND PROCEEDINGS

Colbert is a former employee of the bureau of refugee services (State).[1] She was hired as deputy bureau chief in March 2007 by bureau chief John Wilken. Throughout Colbert's tenure with the State, Wilken was supervised by Jeanne Nesbit.

---

[1] At the time of trial, Colbert remained employed with the State in another executive branch capacity. When referring to her time with the State, we refer exclusively to her time employed by the bureau of refugee services.

Colbert's employment with the State was tumultuous and marked with numerous alleged incidents of racism, sexism, and mistreatment by her superiors and co-workers. Though the details of each incident need not be repeated for purposes of this appeal, the timing of the various allegations is important.

From the beginning of her employment with the State, Colbert contends she observed and was subject to divisions and bickering, attributable to racial and gender bias, between departments within the office. In the early days of her employment, Colbert allegedly brought some of these issues to the attention of a subordinate employee who, Colbert claims, threatened her with retaliation. Colbert claims Wilken did nothing to hold the subordinate employee accountable for these acts. Colbert also claims she was repeatedly called disparaging, racist, and sexist names by another upper-management employee of the State. Again, she testified Wilken did nothing in response.

The alleged name-calling continued for a prolonged period of time. In August 2007, Colbert claims she was physically forced off a sidewalk and onto the hood of a parked car by a co-worker. After confronting the co-worker during a meeting, Colbert claims Wilken verbally attacked her, told her to "shut up," and refused to conduct an investigation or report the incident to human resources.

Colbert also makes additional allegations of improper conduct in the workplace. She claims she was not allowed to exercise her supervisory role over male employees and was stripped of her authority over the office motor pool during the summer of 2008.

In the fall of 2009, Colbert brought her ongoing concerns to the attention of Nesbit, including the allegations of name-calling and the sidewalk incident. Colbert claims Nesbit told her to go back to work and be grateful she had a job. Colbert then took her complaints to the chief operating officer of the Iowa Department of Administrative Services (DAS), who did not respond.

Colbert claims the situation worsened in early 2010 when it became clear a position within the office might be eliminated by the legislature. Wilken informed Colbert her position could be cut and, in an effort to protect another employee from the cut-backs, transferred some of Colbert's supervisory duties to Lauren Bawn. Bawn is the individual who is accused of the racist and sexist name-calling and of shoving Colbert off the sidewalk. During this period, Colbert began seeking employment elsewhere with the State, which is supported by an April 6, 2010 email noting her potential resignation and an official letter of resignation dated April 8, 2010, citing the pending legislation which would eliminate her position.

However, the most significant work incident occurred on April 9, 2010. After disagreeing with a decision made by Wilken, Colbert attempted to discuss the issue with other co-workers. Wilken admitted he "snapped" and began to yell at Colbert, grabbing her arm and directing her into his office where he continued to yell at her. Colbert contends Wilken grabbed and shoved her into his office and physically prevented her from leaving for a time. She reported the incident to the appropriate authorities and filed a complaint with the Iowa Civil Rights Commission. While the complaint was being investigated, Colbert continued to

work for the State without incident until she transferred to new employment with the State at the same salary on April 15, 2010. Wilken was immediately placed on administrative leave for the remainder of Colbert's employment with the State.

Colbert filed her amended petition on March 15, 2011. Her first count alleged the State discriminated against her with respect to the terms and conditions of her employment on the basis of race and gender, or a combination of the two, and subjected her to a hostile work environment in violation of Iowa Code chapter 216 (2009). Her second count alleged assault and battery for Wilken's act on April 9. The assault and battery count was later dismissed by the court.

Following an eight-day trial, and two days of deliberation, the jury returned a verdict for Colbert on her retaliation claim. No monetary damages were awarded. The jury returned verdicts in favor of the State on race discrimination, gender discrimination, hostile work environment based on race, and hostile work environment based on gender.

The State filed a motion for judgment notwithstanding the verdict (JNOV) and a motion for new trial. The State claimed the verdict for retaliation for the April 9, 2010 incident was not supported by substantial evidence. The State further claimed Colbert had failed to sufficiently plead the material facts necessary to constitute a complete claim for any other allegedly retaliatory acts. The district court agreed, finding the jury could have concluded the wrongful physical act on April 9, 2010, was the result of Colbert having engaged in a

protected activity, but also found she had failed to prove any adverse employment action resulted.

## II.  STANDARD OF REVIEW

We review the district court's ruling on a motion for JNOV for errors at law. *Mitchell v. Cedar Rapids Cmty. Sch. Dist.*, 832 N.W.2d 689, 684 (Iowa 2013). Evidence is viewed in the light most favorable to the nonmoving party.  *Wolbers v. The Finley Hosp.,* 673 N.W.2d 728, 734 (Iowa 2003).  The motion is to be overruled so long as there is substantial evidence on each element of the claim. *Id.*  "[I]f reasonable minds could reach different conclusions based upon the evidence presented, the issue is properly submitted to the jury." *Id.*

## III.  ERROR PRESERVATION

Colbert claims she preserved error by filing a resistance to the State's JNOV, which included her assertion her reports, complaints, or oppositions were a motivating factor for the State's retaliatory adverse employment action.  The State claims Colbert did not preserve error on any retaliatory adverse employment action other than the April 9 incident, since no other retaliatory issue was raised or decided by the court.

Error preservation rules exist to provide district courts an opportunity to avoid or correct errors and to provide a record for appellate courts.  *Veatch v. Bartels Lutheran Home*, 804 N.W.2d 530, 533 (Iowa Ct. App. 2011).  A party ordinarily must raise an issue, and the district court must rule on that issue, to ensure preservation for appellate review.  *Duck Creek Tire Serv., Inc. v. Goodyear Corners, L.C.*, 796 N.W.2d 886, 892 (Iowa 2011).  The issue raised at

trial must have been "sufficiently definite to have alerted the trial court to the error claimed so as to have given the court a chance to correct it." *Grefe & Sidney v. Watters*, 525 N.W.2d 821, 825 (Iowa 1994). "If the court's ruling indicates that the court considered the issue and necessarily ruled on it, even if the court's reasoning is 'incomplete or sparse,' the issue has been preserved." *Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012) (citation omitted). Even if a party properly raised an issue, if the district court fails to rule on it, the party must file a motion requesting a ruling on the issue to preserve error. *Kramer v. Bd. of Adjustment for Sioux County*, 795 N.W.2d 86, 93 (Iowa Ct. App. 2010).

Here, in Colbert's civil rights complaint, petition, and other pre-trial motions, she signals only the April 9 incident created the retaliatory adverse employment action. Then, in Colbert's resistance to the State's motion for JNOV, she alleges other adverse employment actions occurred in addition to the April 9 incident.

Colbert claims because Iowa is a notice pleading jurisdiction, the petition put the State on notice that any individual incident during the course of her employment could be the basis of a retaliation claim. We disagree. It is true we are to construe this type of complaint liberally to give effect to the purpose of the civil rights laws. *McElroy v. State*, 703 N.W.2d 385, 390 (Iowa 2005). The petition, however, is also required to give the opposing party "fair notice" of the incident giving rise to the claim and the claim's general nature. *U.S. Bank v. Barbour*, 770 N.W.2d 350, 354 (Iowa 2009). The petition conformed to the 300-day limitation rule found in section 216.15(13) and put the State on notice that

two different claims would be presented: a discrete act and a pattern establishing a hostile work environment.

We find no provision of Iowa law allows a plaintiff to establish a discrimination claim without establishing the discrete act falls within the 300-day period[2] merely because the plaintiff also pled and attempted to support a hostile work environment claim. A holding to the contrary would eviscerate the distinction between discriminatory-act claims and hostile-work-environment claims found in *Farmland Foods*, 672 N.W.2d at 741.

The jury's task in this case was complicated by the intersection of these two types of claims. Evidence was presented on the discrete act from the April 9, 2010 incident, and additional evidence was offered on the larger course of conduct to support her claims. The petition itself makes clear two distinct bodies of evidence were to be presented, one to support each type of discrimination claim. The factual allegations in the petition are divided neatly into two portions. In the first portion, Colbert recounts the entire history of her State employment and the incidents she claimed created "a hostile work environment tied to negative perceptions about race." She then goes on to detail additional incidents as "further examples of the hostile work environment." In the second portion, she details the April 9, 2010 incident, claiming a discrete retaliatory adverse employment action. Colbert's trial brief echoes her petition and points to the incident on April 9 as the only retaliatory adverse employment action.

---

[2] We recognize the limitation defense was not presented at any time during the trial by the State. Our ruling today is not intended to indicate the claims themselves were barred by the limitation period, but rather the limitation period properly contextualizes which facts were being presented to the jury in support of such claims.

The court's order on the State's motion for JNOV relies on the April 9 incident as the sole basis for an adverse employment action:

> The second question is whether Plaintiff suffered an adverse employment action due to the incident of April 9. It is difficult to find record evidence of a substantial nature that she did. Plaintiff remained in the Bureau's employ for a week thereafter. She lost neither wages nor benefits. She was not demoted. For the few remaining days working in the Bureau, she was not confronted with the presence of Mr. Wilken, the offender. By all accounts, she completed her employment tasks during the final week as she had before. Thus, while the physical contact was inappropriate, and promptly addressed by DAS, the record does not support a finding that the "arm grab," standing alone, gave rise to an adverse employment action. Because of the lack of substantial evidence of an adverse employment action, the Court concludes that the motion for judgment notwithstanding the verdict on the retaliation claim should be granted.

We find Colbert intended to present and did present the April 9, 2010 incident as the sole discrete act of retaliation, and only after the JNOV ruling did she attempt to add facts to support two other allegedly retaliatory adverse employment actions. This is the way the district court also understood the posture of the case in its ruling. All other possible examples of adverse employment actions—pled as part of the hostile work environment claim—would have required a separate claim to be filed, and would have fallen outside the 300-day limitation period.

Colbert failed to file a post-ruling motion requesting the court to decide the two new retaliatory actions she raised in her resistance to the JNOV. Even if another retaliatory adverse employment action could arguably be found in the language of Colbert's pre-trial motions and her resistance to the JNOV, Colbert did not raise these additional retaliatory actions in a "sufficiently definite" manner

to put the court on notice.  *Grefe & Sidney*, 525 N.W.2d at 825.  Accordingly, we find Colbert only preserved error on the April 9 incident for the purpose of her retaliatory adverse employment action.

Nevertheless, even though Colbert has only preserved error on the April 9 incident, we exercise our discretion and evaluate the additional adverse employment actions raised by Colbert on appeal.  We believe addressing every aspect of Colbert's argument on appeal, although we are not required to do so, will bring this case to a more satisfactory conclusion.

## IV.   ANALYSIS

Colbert claims the court erred in granting the State's motion for JNOV because the incident on April 9, plus a culmination of the following incidents created an adverse employment action: Wilken trying to force Colbert to leave her position in 2010, Wilken "berating" Colbert for her complaints of verbal and physical harassment, the failure to investigate Colbert's complaints, and Wilken's attempt to undermine Colbert's civil rights complaint in his interview with the DAS.

To establish a prima facie case of retaliation under the Iowa Civil Rights Act (ICRA), a plaintiff must show: (1) he or she was engaged in statutorily protected activity, (2) the employer took adverse employment action against him or her, and (3) there was a causal connection between his or her participation in the protected activity and the adverse employment action taken.  *Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 678 (Iowa 2004).  "Once the plaintiff

establishes a prima facie case, the burden shifts to the employer to rebut a presumption of retaliation." *Id.*

An adverse employment action is an essential element of any racial discrimination in employment claim.[3] *Farmland Foods*, 672 N.W.2d at 741–42. Adverse employment detrimentally affects the terms, conditions, or privileges of employment. *Estate of Harris*, 679 N.W.2d at 679. Our supreme court has recognized a wide variety of facts can constitute a materially adverse employment action.

> It includes subtle conduct such as depriving an employee of the opportunity to advance, as well as more obvious actions such as "disciplinary demotion, termination, unjustified evaluations and reports, loss of normal work assignments, and extension of probationary period." Internal transfers from department to department can also constitute adverse employment action when "accompanied by a negative change in the terms and conditions of employment." However, internal transfers involving "minor changes in working conditions and no reduction in pay or benefits will not constitute an adverse employment action." In other words, minor changes in working conditions that only amount to an inconvenience cannot support discrimination.

*Farmland Foods*, 672 N.W.2d at 742 (citations omitted).

Colbert draws parallels between the April 9 incident and the scenario in *Estate of Harris*. In *Estate of Harris*, the assistant manager of a Papa John's restaurant punched a subordinate employee in the chest for reporting an alleged affair between the assistant manager and another employee. 679 N.W.2d at 675–76. The subordinate employee subsequently died from the punch. *Id.* at

---

[3] The basic elements of a prima facie case of discrimination in employment are: (1) plaintiff is a member of a protected class, (2) plaintiff was performing the work satisfactorily, and (3) plaintiff suffered an adverse employment action. *See Sievers v. Iowa Mut. Ins. Co.*, 581 N.W.2d 633, 638 (Iowa 1998).

676. After Papa John's motion for summary judgment was granted by the district court, Harris appealed. *Id.* Our supreme court retained the case to determine if "the chest shot is not, as a matter of law, an adverse employment action attributable to Papa John's." *Id.* at 678. The court concluded "the chest shot could be construed as an adverse employment action attributable to Papa John's," and a "jury ought to decide whether [the] actions constituted adverse employment action." *Id.* The court reasoned the punch could "constitute adverse employment action," because "Harris's death, after all, did result in termination of his employment." *Id.* at 678–79. "This decision is consistent with our definition of an adverse employment action as an action that detrimentally affects the terms, conditions, or privileges of employment." *Id.* at 679.

Colbert argues our supreme court found the punch alone could establish an adverse employment action. We find this to be an incorrect reading of the court's decision. The punch coupled with Harris's resulting death created the adverse employment action for the retaliation claim. Colbert compares the punch in *Harris* to Wilken's grab of her arm on April 9. Colbert has established that an act occurred, but the record does not show how the act affected "the terms, conditions, or privileges of [her] employment." *Id.* Prior to the April 9 incident, Colbert began seeking employment elsewhere with the State, which is supported by an April 8, 2010 email informing Wilken of her resignation. The email reveals Colbert and Wilken had been discussing her departure due to the imminent elimination of her position as a result of "new supervisor to staff ratio legislation." Her last full day working for the State was scheduled for April 15, 2010. Colbert's

employment was set to change before the April 9 arm grab occurred, due to legislation rather than an act by her employer. After the incident, Wilken was placed on administrative leave and the two of them never worked together again. Finally, Colbert claims Wilken grabbed her arm to "dissuade her from making further complaints." The record does not support this contention. The record shows Wilken grabbed Colbert's arm out of frustration as she questioned his decision making in front of the other employees. We conclude the arm grab did not establish an adverse employment action.

Colbert claims "numerous adverse employment actions from 2007 through May 2010" could support the jury verdict. We are not convinced the record viewed in a light most favorable to Colbert supports this contention. Like the April 9 incident, these actions do not meet the prima facie requirements of a retaliation claim under the ICRA. Even if the acts complained of occurred in the manner described by Colbert, no adverse employment action resulted. The record reveals a toxic work environment existed, but does not show how the "terms, conditions, or privileges of [her] employment" were impacted by this work environment. *Id.* at 679. For these reasons, we affirm the district court's decision.

## V.    CONCLUSION

Having found the district court properly focused on the April 9, 2010 incident as the sole possible adverse employment action, we agree with the court's assessment that evidence of an adverse employment action is difficult to locate in the record. Colbert remained employed with the State for just a few

days after the incident and had no interaction with Wilken during that time. The incident did not impact her duties or responsibilities, her wages or benefits. She completed her employment after the incident without further complication, and the incident was addressed promptly and appropriately by the State. Additionally for the same reasons, construing the record in the light most favorable to Colbert, none of the other acts she claims are adverse employment actions can be interpreted as such. We agree with the district court that the State's motion for judgment notwithstanding the verdict should have been granted, and we affirm.

**AFFIRMED.**

**VAITHESWARAN, J.,** (concurs specially)

I specially concur. I disagree with the majority's conclusion that Colbert limited her retaliation claim to the April 9, 2010 incident. Her amended petition broadly alleged "Defendants retaliated against Plaintiff because of her complaints and opposition to discrimination." Additionally, Wilken was questioned at trial about claimed retaliatory conduct reaching well beyond the April 9, 2010 incident. Finally, the jury instruction on retaliation was not limited to the April 9, 2010 incident. In my view, the jury could consider conduct predating April 9, 2010, in deciding whether there was retaliation.

That said, I agree Colbert failed to present substantial evidence of "adverse employment action." The phrase was defined for the jury as "action that detrimentally alters or adversely affects the terms, conditions, or privileges of employment." While the jury was told "[a] wide variety of actions, some blatant and some subtle" could qualify as adverse employment action, the jury was also instructed "[i]t was not sufficient to show changes in duties or working conditions that do not cause materially significant disadvantages to the employee."

In her resistance to the State's judgment notwithstanding the verdict, Colbert cited the arm-grab incident, a conversation with Wilken in early 2010, and Wilken's statements to an investigator as "adverse employment action." I will address these three events.

Some language in *Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673 (Iowa 2004) supports Colbert's assertion that the arm-grab incident constituted adverse employment action. Specifically, the court stated, "[w]e see no reason

why punching an employee for making a report of sexual harassment cannot constitute adverse employment action." *Harris*, 679 N.W.2d at 678. However, as the majority explains, the court went on to tie this statement to the plaintiff's death.

Colbert also asserted Wilken encouraged her to seek other employment in early 2010 and this conversation amounted to adverse employment action. But Colbert acknowledged the discussion was general in nature and focused on the lack of certainty as to whether proposed legislation on a supervisor to subordinate ratio would apply to either of them.

Colbert additionally suggested Wilken attempted to undermine her civil rights complaint in his interview with an investigator, and his statements to the investigator constituted adverse employment action. But the interview took place almost a month after Colbert's resignation.

Like the majority, I conclude the "adverse employment action" element of Colbert's retaliation claim is not supported by substantial evidence. Accordingly, I agree with the majority's disposition of the claim.