JAMES E. GRITZNER, Senior Judge
This matter comes before the Court on motion for summary judgment brought by Defendants Embassy Suites Franchise, LLC; Hilton Worldwide Holdings, Inc.; Hilton Worldwide, Inc.; and Atrium TRS III, LP as to Count One. Those Defendants, along with Defendant John Q. Hammons Hotels Management, LLC, also move for summary judgment as to Count Two. Plaintiff Cheri Marchionda resists. The Court held a hearing on the motion on September 17, 2018. Representing Plaintiff were attorneys Paul Brandes, Michael Hanamirian, and Fred James. Representing Defendants were attorneys Fred Sager, M. Alan Holcomb, Mark Schultheis, and Spencer Cady. The matter is fully submitted and ready for disposition.
I. BACKGROUND
A. Factual Background
The following facts are either not in dispute or viewed in the light most favorable to the nonmovant. See Sharbono v. N. States Power Co., 902 F.3d 891, 892, 895 (8th Cir. 2018).
From April 9-11, 2014, Marchionda was a business-travel guest at the Embassy Suites on the River (the Hotel). Marchionda checked into the Hotel on the evening of April 9 and was assigned to guest room 732. Marchionda did not authorize the Hotel to give any other person a key to her room. After checking into her room, Marchionda went downstairs to the Hotel's restaurant/bar to have dinner. While there, Marchionda was approached by Christopher LaPointe (LaPointe), who was also a guest at the Hotel and assigned to guest room 830. According to Marchionda, LaPointe made small talk for a few minutes, then left the restaurant. Marchionda then asked for her bill from the bartender, Amy Nicholson (Nicholson). Referring to LaPointe, Marchionda asked Nicholson if the restaurant got "a lot of people in here that are like that, meaning intoxicated," to which Nicholson responded, "[H]e's a regular. He's harmless." Marchionda 1st Dep. 50, Pl.'s App. 161, ECF No. 238-4. After leaving the restaurant, Marchionda got on the elevator to go to her room, and as she did so, LaPointe came around the corner and got on the elevator with Marchionda. When Marchionda exited the elevator at the seventh floor, LaPointe remained on the elevator.
On the evening of April 10, 2014, after completing work, Marchionda returned to the Hotel, and went to the Hotel restaurant/bar *685 to meet two co-workers. While waiting for her co-workers, LaPointe approached Marchionda and sat down at her table. Marchionda's co-workers arrived, but LaPointe remained at the table. According to Marchionda, LaPointe, who was visibly intoxicated, ordered and was served 6 to 8 beers and several shots of whiskey, and he also bought a round of whiskey shots for everyone at the table. Thereafter, Marchionda and her co-workers left the restaurant and went to their respective rooms. Marchionda entered her room alone, closed and locked the door, placed the metal security bar latch across the door frame, and went to sleep sometime before midnight. After Marchionda and her co-workers left the restaurant, the bartender, Nicholson, told LaPointe that he "struck out again," to which LaPointe responded, "The night's not over yet." LaPointe Dep. 247-48, Pl.'s App. 219-20, ECF No. 238-4.
Around midnight, LaPointe went to the front desk of the Hotel and asked for a key to guest room 732. Libby Hennings, a manager at the Hotel who was getting ready to leave for the day, directed the night manager on duty, Carol LeMay, to give LaPointe the key; LeMay did so. LaPointe never produced identification or any other indicator that he was entitled to a key to guest room 732. LaPointe then went to guest room 732 and attempted to unlock the door using the key LeMay had given to him. The key disengaged the deadbolt, but the security latch was engaged, so LaPointe was only able to open the door a few inches. LaPointe then called the front desk, asking for assistance to enter guest room 732. The Hotel maintenance engineer on duty, Anthony Caligiuri, was directed to go to guest room 732 and to assist LaPointe in entering the room, which Caligiuri did.
Marchionda testified that she was awakened in the early morning hours of April 11, 2014, by something touching her leg. LaPointe got on to the bed, restrained Marchionda, and began sexually assaulting her. Marchionda later reported the assault, LaPointe was arrested, and he ultimately pled guilty to third degree burglary and third degree sexual assault.
Neither the seriousness of the events nor the harm to Marchionda is now before the Court. Rather, the pending motion deals with potential legal responsibility for the events and harm.
1. The Hotel Business Model[1]
The Hotel was operated by Atrium TRS III, LP (Atrium or Franchisee) pursuant to a franchise license agreement (FLA) with Embassy Suites Franchise, LLC (Embassy Suites or Franchisor).[2] Embassy Suites was a subsidiary of Hilton Worldwide, Inc. (HW); HW is wholly owned by Hilton Worldwide Holdings, Inc. (HWH). (HW, HWH, and Embassy Suites are collectively referred to as "Hilton.") Atrium and John Q. Hammons Hotels Management, LLC (Hammons) entered into a management services agreement (MSA), under which Hammons provided management services for a number of hotels, including the Embassy Suites on the River.
*686 For purposes of this Order, Hilton, Atrium, and Hammons are collectively referred to as Defendants.
Embassy Suites had no independent or direct contractual relationship with Hammons. However, the FLA required that if Atrium chose to manage the Hotel through a management company, the chosen management company, in this case Hammons, was subject to the written approval of Embassy Suites. In addition, the management company was required to have the authority to perform all of Atrium's obligations under the FLA. The FLA further provided that if any conflict arose between the terms of the FLA and terms of MSA, the FLA prevailed. Under the MSA, Hammons also agreed to abide by, and to be subject to, Embassy Suites' rules, regulations, and inspections; and Atrium understood Embassy Suites could communicate directly with Hammons regarding day-to-day operation of the Hotel without first going through Atrium.
Hilton had no direct responsibility of any kind for the day-to-day activities or the personnel working at the Hotel on the date of the incident. However, Hammons' designated representative, Joe Morrissey, affirmed at his deposition that under the MSA, "Embassy Suites Franchise and Hilton ha[d] the right to [determine Hammons' specific safety and security policies/procedures were inadequate and needed to be updated or reviewed], it also had the right to communicate with the management company ... as to the day-to-day operation and functioning of the [H]otel in Des Moines." Morrissey Dep. 155, Pl.'s App. 83, ECF No. 238-4. Morrissey also acknowledged that Hammons' relationship with Hilton was based on Hammons "standing in the shoes of [Atrium]," and because of that relationship, Hilton (1) "had the right to demand ... an adequate performance under the agreements"; (2) "had the right to oversee the operation of the [H]otel" as it applies to the Hilton Brand Standards (the Brand Standards); and (3) had "the right ... to oversee and review policy and procedures of the management company dealing with safety and security." Id. at 153-54, Pl.'s App. 82-83, ECF No. 238-4. Morrissey also acknowledged that "to the extent that Hilton or Embassy Suites Franchise entities determined that the policies and procedures of [Hammons] specific to safety and security were somehow inadequate or needed updating or needed reviewed [sic], they had the right to demand that." Id. at 154, Pl.'s App. 83, ECF No. 238-4.
Hilton did not directly employ, control, or supervise any staff at the Hotel on the date of the assault. Marchionda contends that the FLA spells out Hilton's responsibilities related to personnel and day-to-day operations, including personnel training, continuous access to reservation services and systems, and consultation and advice in operations. Marchionda also identifies that the FLA required Atrium to confirm it had independently investigated the risks of operating a hotel under the Brand and had reviewed the Embassy Suites Hotels' Franchise Disclosure Document (FDD). Among other things, the FDD summarizes certain provisions of the FLA and identifies Hilton's responsibilities relating to Hotel activities and personnel. Hilton's representative, Alan Roberts, identified that the purpose of the FDD was "to disclose to the potential franchisee the expectations, the fees, the officers[-j]ust a variety of things in there that the franchisee would be interested in knowing about the company that they're going to do business with." Roberts Dep. 222-23, Pl.'s App. 24, ECF No. 238-4.
The FDD lists Hilton's required responsibilities, which includes ongoing training of various Hotel personnel and providing *687 continuous access to the guest reservation system. The FDD specifies several forms of training, the time frames in which each training must be completed, and the consequences for not completing the training, including notification of non-compliance being sent to Hilton. Non-compliance with material obligations set out in the FLA within the required time period, including non-compliance with all Brand Standards, could result in Hilton removing the Hotel from Hilton directories and advertising, and removing or suspending the Hotel from Hilton's guest reservation system OnQ Central Reservations. Hilton clarifies that it only had the right to evaluate the owner or operator of the Hotel was in compliance with the Brand Standards.[3] Hilton states that if a franchisee is found in violation of the Brand Standards, the violation will be noted in a report and the franchisee will be expected to address the violations with the management company. Hilton requires the franchisee to take corrective action for deficiencies found on inspection.
a. The Franchise Licensing Agreement
Defendants state that the FLA governed the relationship between Embassy Suites by Hilton and Atrium; and it authorized Atrium to operate the Hotel under certain "marks," including the license, brand, service marks, copyrights, trademarks, logos, insignia , emblems, symbols, designs, slogans, and trade names of the Embassy Suites "brand." Marchionda contends that although Embassy Suites and Atrium were the only parties to the FLA, the aforementioned FDD, adopted as part of the FLA, also identified HW as a party that fulfilled responsibilities of Embassy Suites under the FLA. The FLA governed the relationship between Embassy Suites as franchisor, Atrium as franchisee, and Hammons as the management company.
The FLA identifies Atrium as an independent contractor and that Embassy Suites and Atrium were not legal representatives of one another; they were powerless to obligate or to direct the daily affairs of the other; their relationship was governed solely by the FLA; and "no partnership, joint venture, agency, fiduciary or employment relationship [was] intended or created by reason of the[e] [FLA]." FLA ¶ 15.a., Defs.' App. 57, ECF No. 213-2. Under the FLA, Atrium agreed to indemnify Embassy from "all losses, costs, liabilities, damages, claims, and expenses ... arising out of or resulting from ... any bodily injury, personal injury, death or property damages suffered or claimed by any guest, customer visitor, or employee of the Hotel." FLA ¶ 9, Defs.' App. 46, ECF No. 213-2. Atrium and Embassy Suites further agreed that Embassy Suites and its related entities would not be held responsible for any debts, damages, or liabilities "related to the ... operation of the Hotel or arising out of or related to [Atrium]'s policies, procedures, practices or alleged practices in the operation of the Hotel." FLA ¶ 15.a., Defs.' App. 57, ECF No. 213-2. Pursuant to paragraph 15(b) of the FLA, Atrium was required to notify the public that it was an independent contractor and not part of Embassy Suites, and to notify suppliers and third parties that Embassy Suites had no liability for Atrium's debts. Paragraph 6 of the FLA required Atrium to operate the Hotel in compliance with the Brand Standards, to *688 maintain legal possession and control of the Hotel, to maintain insurance for the Hotel, to be responsible for the staff and management of the Hotel, and to obtain and maintain the Hotel's alcohol license. Compliance with the Brand Standards triggered other requirements, such as restrictions and specifications on the purchase of products and services; the installation, display, and maintenance of signage containing the Brand name or mark; staff training; and Hotel operations. The Brand Standards mandated such things as the type of guest room security swing bar latch to be used. The Brand Standards also had a required master key policy, but not a guest room key policy. Roberts testified that the Brand Standards included a master key policy but not a guest room key policy because guest room key control was a function of the management company.
Under paragraph 6 of the FLA, Atrium was granted responsibility for management of the Hotel, and Hilton's role with respect to the Hotel involved reservations, marketing, quality assurance/inspections, and access to the licensed brand's materials, policies, and programs. Hilton provided training programs, trained hotel workers, designed and authored training materials, and consulted and advised in hotel operations. Participation in Hilton's training programs was required of all Embassy Suites. Hilton required the Manager on Duty program and conducted certification of Hotel employees. Roberts testified that the Hilton Worldwide University program, which, for the most part, was designed by Hilton Worldwide, provided the required training coursework. Hilton had the right to approve and reject the Hotel's hiring of the management company, the general manager, and the director of sales; and to assign a Hilton email address to the Hotel's general manager. The FLA also provides that "[i]f [Hammons] becomes a Competitor or [Hammons] and/or the General Manager otherwise becomes unsuitable in [Hilton's] sole judgment to manage the Hotel at any time during the License Term, [Atrium] will have ninety (90) days to retain a qualified substitute Management Company and/or General Manager acceptable to us." FLA ¶ 6.c., Defs.' App. 43, ECF No. 213-2.[4]
Embassy Suites generally had the right to approve or disapprove of the selection of the management company, the General Manager of the Hotel, and the Director of Sales for the Hotel, but did not have the right to request a change in the management company or the persons holding those positions. Rather, Embassy Suites simply had the right to raise any concern in that regard with the ownership, but the decision to change any of those positions fell to the ownership group itself. Embassy Suites did not have the right to approve or disapprove of the selection of any other positions at the Hotel. The management company was subject to Embassy Suites' approval simply to ensure it has the appropriate structure and support to properly run a hotel or has a track record of properly operating hotels.
The Staff and Management provision of the FLA, in relevant part, states:
You are at all times responsible for the management of the Hotel's business. You may fulfill this responsibility only *689 by providing: (i) qualified and experienced management, which may be a third-party management company (the "Management Company"); and (ii) a general manager ("the General Manager"), each approved by us in writing. However, you represent and agree that you have not, and will not, enter into any lease, management agreement or other similar arrangement for the operation of the Hotel or any part of the Hotel with any person or entity without our prior written consent. To be approved by us as the operator of the Hotel, you, any proposed Management Company, and any proposed General Manager must be qualified to manage the Hotel. We may refuse to approve you, any proposed Management Company or any proposed General Manager which, in our reasonable business judgment, is inexperienced or unqualified in managerial skills or operating capacity or capability, or is unable to adhere fully to the obligations and requirements of this Agreement.... If the ... Management Company and/or the General Manager otherwise becomes unsuitable in our sole judgment to manage the Hotel at any time during the License Term, you will have ninety (90) days to retain a qualified substitute Management Company and/or General Manager acceptable to us. Any Management Company and/or General Manager must have the authority to perform all of your obligations under this Agreement, including all indemnity and insurance obligations. In the case of any conflict between this Agreement and any agreement with the Management Company or General Manager, this Agreement prevails.
Id.
b. The Management Services Agreement
Under the MSA, Atrium appointed "[Hammons] as its sole and exclusive management company to supervise and direct for and at the expense of [Atrium], the management and operation of [Atrium's properties]." MSA ¶ 1.A., Defs.' App. 104, ECF No. 213-5. Under the MSA, Atrium assumed the responsibility for the costs of "obtaining and maintaining" all licenses and permits necessary for operation of the Hotel. MSA-Ex. C ¶ 1, Defs.' App. 129, ECF No. 213-5. The MSA states that Atrium and Hammons "shall cooperate fully with each other to determine the nature and extent of and obtain all permits and satisfy all conditions and material legal requirements connected with the issuance of said licenses in order to ensure uninterrupted operation of the [Atrium]'s Properties." Id. The provision further states that "[a]ll costs of obtaining and maintaining such licenses and permits, including any licenses to be held in the name of [Hammons] will be at [Atrium]'s expense." Id.
Under the MSA, Hammons was:
• granted responsibility for "[s]upervising and operating the [Hotel], including the operation of ... [the] restaurant and bar."
• obligated to select, hire, manage, and supervise "all on-site supervisory personnel and all other personnel in connection with the operation of the [Hotel], including ... restaurant(s) and bar(s)."
• responsible for supervising and directing the "entertainment policies in the restaurant(s), bar(s), and associated convention and banquet facilities."
• required to "supervise and direct the work of, and discharge as required, all personnel working on and directly for the [Hotel]."
• exercised the "sole judgment of the fitness and qualifications of [Hotel]
*690 employees and at its discretion shall hire, discharge, supervise and direct such employees during the course of their employment."
MSA-Ex. C ¶¶ 10.A.1, .2, .5; 13.A, Defs.' App. 131, 136, ECF No. 213-5.[5]
Under the FLA, as the Hotel owner, operator, and franchisee, Atrium shared all responsibilities in the MSA with Hammons. See FLA ¶ 6.c, Defs.' App. 43, ECF No. 213-2 ("You are at all times responsible for the management of the Hotel's business.... Any Management Company and/or General Manager must have the authority to perform all of your obligations under this Agreement, including all indemnity and insurance obligations."). Maximizing profit was a stated goal. See MSA ¶ 10.A.1., Defs.' App. 131, ECF No. 213-5 ("Supervising and operating the Owner Properties, including the operation of any associated convention and banquet facilities, restaurant and bar, in order to obtain the desired goal of maximum profit."). The MSA required that in hiring, managing, and supervising personnel in connection with the operation of the Hotel, Hammons was required to establish and review acceptable standards for the Hotel with Atrium's representatives. See Morrissey Dep. 151-52, Pl.'s App. 82, ECF No. 238-4. Atrium's representative, Daniel Abernathy, testified that Atrium (1) reviewed with Hammons its operating standards, policies, procedures, rules, and regulations applicable to the operation of the Hotel; (2) reviewed and/or supervised Hammons regarding its establishment and implementation of certain standards of quality and price; (3) paid Hammons a management fee, which included costs for day-to-day operation of the Hotel; and (4) provided Hammons with working capital (that was not repaid) to meet expenses in operating the Hotel, which included payroll and operating expenses. Hammons was responsible for supervising and directing the establishment of entertainment policies, but was not solely responsible for implementing those ongoing operations.
Defendants aver that Embassy Suites, HW, HWH, and Atrium did not employ, control, or supervise any staff or employees at the Hotel and that Atrium relied on Hammons to complete the education and training of Hotel employees. Marchionda contends that although the Hotel personnel involved in the incident-front desk clerk LeMay, on-duty manager Henning, on-duty bartender Nicholson, and maintenance engineer Caligiuri-were not W-2 employees of Hilton; they were Hotel employees, and as such, Hilton did control and supervise them in the manner discussed above.
2. Key Control Policies
Defendants assert the FLA makes reference to a manual written by Embassy Suites, which includes requirements for construction, equipping, furnishing, supplying, operating, maintaining, and marketing of the Hotel, but that at the time of the incident, the only applicable policies, procedures, rules, and regulations Embassy Suites had were the 2014 Brand Standards. Marchionda disagrees, adding that the Hilton training programs and videos also outlined policies and procedures set out in the Brand Standards and the FLA, and that the FDD also recites standards, policies, and procedures.
Although Hilton states that the Brand Standards required each management company or hotel operator to provide its own safety and security standards manual and practices, Marchionda counters that the Brand Standards manual includes a *691 specific obligation that "the Hotel" have a written plan and to provide ongoing training. See Embassy Suites Global Operating Standards (Brand Standards) § 1503.02.A, Pl.'s App. 119, ECF No. 238-4 ("The hotel must have written, hotel-specific plans and provide ongoing training ...."). The Brand Standards identifies "the Owner" as the owner operating under a FLA, which, in this case, is Atrium.
Defendants assert Atrium did not review Hammons' work, but instead Atrium relied on Hammons to adhere to the Brand Standards, which required the Hotel to have written, hotel-specific plans in place and to provide ongoing training in emergency situations, including security issues such as assault, theft, robbery, or suicide. Hilton did not produce or provide security manuals to franchisee hotels, including the subject Hotel, nor did Hilton specify the nature of the security plan the Hotel should use. In April 2014, the issues of security and security contracts/agreements at the Hotel were not a function of HW, HWH, or Embassy Suites. Nor, at that time, did Atrium employ any security personnel at the Hotel. Marchionda points out that the Brand Standards required specific type locks on Hotel guest room doors, which Hilton could inspect on a random selection of guest room doors in its annual inspections. See Andring Dep. 91, Pl.'s App. 123, ECF No. 238-4. Marchionda concedes that Atrium did not employ any security personnel at the Hotel, but points out that security guard services were included in Atrium and Hammons' annual budget.
Hilton asserts although the Brand Standards manual established that the hotel "must implement a written key control program" and addressed the issuance of a "master" set of keys for the Hotel, the Brand Standards manual did not address a key control policy for guest room keys and it was not a function of Embassy Suites, HW, or HWH to distribute keys. Accordingly, Embassy Suites, HW, and HWH did not have any policy, procedure, protocol, rule, or regulation regarding the issuance of guest room keys to customers or guests at the Hotel. Marchionda points to Roberts being unable to explain why the Brand Standards has a policy for master keys, but not for guest room keys.
Hammons established the written key control policy titled, "Key Control & Procedures Policy." Neither Embassy Suites, HW, nor HWH wrote that policy. Marchionda denies the policy was written solely by Hammons as it is on Embassy Suites letterhead and makes no mention of Hammons; whereas, the title page to the company policy guidelines applicable to the Hotel titled, "Company Policy Guidelines-Atrium," prominently contains Hammons' logo. Morrissey testified that Hammons did not have a standardized key policy applicable to all properties it managed; and when asked why it did not, Morrissey responded that the policy it had in each hotel at the time was adequate. In response to how Hammons knew its policy was adequate, Morrissey said it was because Hammons' regional vice presidents and its internal auditors conducted regular visits and approved "all of that." See Morrissey Dep. 57-62, Pl.'s App. 62-64, ECF No. 238-4. Morrissey admitted, however, that he had no knowledge whether anyone actually reviewed the key control policy, conceding it was "an informal policy," and finally affirmed that no one "at Hammons ever made any effort to review all of the policies and procedures on key control at each of the hotels that Hammons manages." Id.; Morrissey Dep. at 136, Pl.'s App. 79, ECF No. 238-4.
Hilton further asserts Atrium did not review Hammons' policies with respect to hotel security or the issuance of guest keys, and that although the Brand Standards *692 allowed Embassy Suites to provide required training elements, none of the training elements within the Brand Standards addressed the issuance of guest room keys or hotel and guest security and safety.
Hilton's final assertion is that on the date in question, the Hotel manager, Libby Hennings, did not know that LaPointe asked for a key to a guest room to which he was not registered. As Marchionda points out, Hennings testified that she did not know for which guest room LaPointe was seeking a key, but assumed he was asking for a key to his own room.
B. Procedural Background
On June 15, 2015, Marchionda filed a two-count complaint in the U.S. District Court for New Jersey against Embassy Suites, Inc.; Embassy Suites Franchise, LLC; Embassy Suites Management, LLC; Hilton Worldwide; Hilton Worldwide Holdings, Inc.; Hammons, Inc. f/d/b/a John Q. Hammons Hotels, Inc.; John Q. Hammons Management, LLC; Atrium TRS III, LP; and John Doe Corporations 1-10,[6] asserting a claim for negligence, gross negligence, recklessness, and willful wanton and outrageous conduct (Count One); and a claim for punitive damages (Count Two). On the parties' joint motion, the case was transferred to this Court on December 29, 2015.
On February 19, 2016, Defendants moved to dismiss Embassy Suites Management, LLC, HWH, HW, and John Q. Hammons Hotels, Inc. Shortly thereafter, Marchionda amended her complaint adding Hilton Franchise Holding, LLC, as successor in interest to Embassy Suites Franchise, LLC. Defendants were granted leave to file a third-party complaint against LaPointe.
On July 12, 2016, John Q. Hammons Hotels Management, LLC filed notice of bankruptcy, and the case was stayed until the bankruptcy stay was lifted on February 21, 2017. On March 22, 2017, and June 29, 2017, respectively, Marchionda and LaPointe each moved to strike Defendants' third-party complaint. On August 23, 2017, the Court entered an order denying Defendants' motion to dismiss and granting LaPointe's motion to strike; Marchionda's motion to strike was denied as moot. On July 5, 2017, and February 23, 2018, respectively, Marchionda also filed stipulations of dismissal as to Embassy Suites Management, LLC and John Q. Hammons Hotels, Inc.
On March 2, 2018, Atrium, Embassy Suites, HW, and HWH filed this motion, arguing they are entitled to summary judgment on Count One because they did not owe Marchionda a duty of care under the retained control standard. Hilton and Atrium along with John Q. Hammons Hotels Management, LLC, also move for summary judgment on Count Two, asserting there is no evidence in the record to support willful and wanton conduct to permit the submission of punitive damages to the jury. Marchionda resists, arguing Hilton and Atrium are not entitled to summary judgment on Count One because they all owed her duties of care; nor are Defendants entitled to summary judgment on Count Two because their conduct rises to the level of legal malice.
II. DISCUSSION
A. Standard for the Motion
"The court shall grant summary judgment if the movant shows that there is no *693 genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact.' " Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (alterations in original) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ). If the movant makes such a showing, to avoid summary judgment the nonmovant must "set out 'specific facts showing that there is a genuine issue for trial.' " Id. (quoting Celotex, 477 U.S. at 324, 106 S.Ct. 2548 ). The Court views the facts presented on summary judgment in the light most favorable to the nonmovant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, a genuine issue for trial requires more than "some metaphysical doubt as to the material facts." Torgerson, 643 F.3d at 1042 (quoting Matsushita, 475 U.S. at 586, 106 S.Ct. 1348 ).
B. Duty of Care
Hilton[7] and Atrium argue they did not control the daily operations of the Hotel and thus cannot be deemed a "possessor" of the Hotel under Restatement (Second) of Torts §§ 328E, 344, or 414. Consequently, Plaintiff's negligence claim against them should be dismissed as a matter of law because they did not owe Plaintiff any duty of care. Marchionda counters that Hilton is liable to Marchionda on an ostensible agency basis, Atrium is directly liable to Marchionda because it owes a non-delegable duty of care as the owner of the Hotel, and both Hilton and Atrium are liable for failing to train and supervise Hammons' personnel.
"An actionable negligence claim requires 'the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages.' " McCormick v. Nikkel & Assocs., Inc., 819 N.W.2d 368, 371 (Iowa 2012) (quoting Thompson v. Kaczinski, 774 N.W.2d 829, 834 (Iowa 2009) ). "It is well-settled that 'questions of negligence or proximate cause are ordinarily for the jury,' and 'only in exceptional cases should they be decided as a matter of law.' " Thompson, 774 N.W.2d at 832 (quoting Clinkscales v. Nelson Sec., Inc., 697 N.W.2d 836, 841 (Iowa 2005) (per curiam) ). "Whether a duty arises out of a given relationship is a matter of law for the court's determination." McCormick, 819 N.W.2d at 371 (quoting Thompson, 774 N.W.2d at 834 ).
The Iowa Supreme Court has stated, "[a]s a general rule the law imposes no duty upon an individual to act for the protection of others." Garofalo v. Lambda Chi Alpha Fraternity, 616 N.W.2d 647, 652 (Iowa 2000) (citing Restatement (Second) of Torts § 314 (Am. Law Inst. 1965) ).
Likewise, there is no duty to control the conduct of third persons so as to prevent that person from causing physical harm to another unless:
(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
(b) a special relation exists between the actor and the other which gives to the other a right to protection.
Id. (citing Restatement (Second) Torts § 315 ). "Commonly recognized 'special relations' include common carrier/passenger, *694 innkeeper/guest, landlord/invitee, and peace officer/arrestee." Id. (citing Restatement (Second) of Torts § 314A ). Section 314A of the Restatement (Second) of Torts, which identifies special relationships giving rise to a duty to aid or protect, states:
(1) A common carrier is under a duty to its passengers to take reasonable action
(a) to protect them against unreasonable risk of physical harm, and
(b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
(2) An innkeeper is under a similar duty to his guests.
(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation
(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.
The Iowa Court of Appeals has identified a hotel's duty to its guests, as follows:
A hotel is under a duty to its guests to protect them from unreasonable risk of physical harm. Restatement (Second) of Torts § 314A (Am. Law Inst. 1965). Because of the special relation, this duty extends "to risks arising ... from the acts of third persons, whether they be innocent, negligent, intentional, or even criminal. (See § 302B.)." Id. § 314A, cmt. d; see also Restatement (Third) [of Torts] § 40 [ (Am. Law Inst. 2012) ] (noting "an innkeeper with its guests" is a special relationship imposing upon the innkeeper "a duty of reasonable care with regard to risks that arise within the scope of the relationship").
Benninghoven v. Hawkeye Hotels, Inc., No. 16-1374, 902 N.W.2d 593, 2017 WL 2684351 at *4 (Iowa Ct. App. June 21, 2017) (unpublished table decision).
Defendants argue that Hilton and Atrium did not control the daily operations of the Hotel and therefore cannot be deemed possessor of the Hotel under the Restatement. Relying on Hoffnagle v. McDonald's Corp., 522 N.W.2d 808, 814 (Iowa 1994), in the franchisor circumstance, Defendants argue a duty of care is imposed only when the defendant retains control over daily operations of the land, "which is necessarily and properly determined as a matter of law by the court." Hilton's and Atrium's roles in this case differ, therefore the Court separately analyzes whether each had a duty to Marchionda.
1. Hilton
a. Franchisor Relationship
In Hoffnagle, the plaintiff worked at a McDonald's restaurant franchise. Id. at 810. Her employer was Rapid-Mac, Inc., a corporation owned by Gerald and Judith Mrozinski. The Mrozinskis were licensees/franchisees of the McDonald's restaurant, by virtue of an agreement with licensor/franchisor McDonald's Corporation. Id. McDonald's owned the real property where the restaurant was located. Id.
Hoffnagle was attacked by two customers while working shift at the restaurant. Id. After the attack, Hoffnagle filed for, and received, benefits through her employer, Rapid-Mac, Inc., under the Iowa workers' compensation statute. Id. Hoffnagle then filed a lawsuit against McDonald's, asserting that "McDonald's owned and controlled, or had the right to control, the restaurant and property where plaintiff was assaulted," and that her damages were "proximately caused by McDonald's *695 alleged negligence in the exercise of such control." Id. at 811. Citing the license agreement between McDonald's and the Mrozinskis, Hoffnagle argued McDonald's owned and controlled, or had the right to control, the property where she was assaulted, noting that McDonald's required the licensee's adherence to standards and policies for providing for the uniform operation of all McDonald's restaurants within the McDonald's system. Id. at 810-11. Hoffnagle further pointed out that the licensing agreement required, among other things, that the licensee adopt and use business manuals prepared by McDonald's and make training available at Hamburger University training center, which the licensee and its managerial employees had to attend. Id. at 810. The licensing agreement gave McDonald's the right to inspect the restaurant to ensure that the licensee was operating the restaurant in compliance with McDonald's standards and policies, and if the licensee failed to comply with McDonald's standards and policies, McDonald's had the right to terminate the agreement. Id. at 810-11. McDonald's moved for summary judgment, arguing it owed no duty to provide Hoffnagle a safe place to work, as those duties were the responsibility of Hoffnagle's employer. Id. at 811.
The Iowa Supreme Court reasoned that the trial court properly considered the duty analysis under Restatement (Second) Torts § 414, which provides:
One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.
Id. (quoting Restatement (Second) Torts § 414 ). The court agreed with the trial court's conclusion that the "closest analogy" to "the liability of a franchisor for injuries suffered by employees of a franchisee, ... is that of employer-independent contractor" relationships. Id. at 812. The court went on to discuss, and agree with, other jurisdictions that used "the employer-independent contractor analogy in determining whether a franchisor owes a duty to its franchisee's employee." Id. at 813. The court then looked at the definition of "possessor of land" under Restatement (Second) of Torts § 328E, which defines a possessor of land as "a person who is in occupation of the land with intent to control it." Id. (quoting § 328E ). The court noted that "the mere fact of ownership is not sufficient to impose liability," instead whether someone "is a possessor of land ... depends primarily upon the amount of control that a particular person exercises over the property." Id. (alteration in original) (citations omitted) (quoting Galloway v. Bankers Tr. Co., 420 N.W.2d 437, 441 (Iowa 1988) ; Downs v. A & H Const., Ltd., 481 N.W.2d 520, 524 (Iowa 1992) ). The court, citing Restatement (Second) of Torts § 414, reasoned, "the employer's control of the daily operation of the business determines its obligation and thus its liability." Id.
As the Hoffnagle court noted, for § 414 to apply, "the employer must have retained at least some degree of control over the manner in which the work is done." Id. (quoting Restatement (Second) of Torts § 414 cmt. c). Moreover, "[i]t is not enough that [the employer] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. " Id. (quoting Restatement (Second) of Torts § 414 cmt. c). As comment c to § 414 explains, "[s]uch a general right is usually reserved to employers, but *696 it does not mean that the contractor is controlled as to his methods of work, or as to operative detail"; rather, "[t]here must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way. Id. (quoting Restatement (Second) of Torts § 414 cmt. c). The court observed that in the employer-independent contractor law context, a duty of care is imposed "only when the employer retains control of day-to-day operations," and thus "[t]he employer's retention of the right to inspect the quality of the operation and of control over the work to the extent necessary to implement that right will not give rise to a legal duty." Id.
Borrowing the employer-independent contractor analogy, the Hoffnagle court adopted the retained control test to determine when a franchisor owes a duty of care to its franchisee's employee. Id. at 814. Agreeing with other jurisdictions having considered the issue, the court stated, "the test for the existence of a franchisor's duty of care to its franchisee's employee is the extent of the franchisor's control of the daily operation of the business." Id. The court applied the rule in analyzing whether McDonald's retained control over the operations and the restaurant property. Id. The court reasoned the Mrozinskis: owned the business equipment, operated the business, held the operating license and permits, determined wages, provided basic daily training, and provided insurance for the franchisee's employees. Id. The court also noted that the Mrozinskis, not McDonald's, hired, fired, supervised, and disciplined the franchisee's employees, and that "McDonald's simply ha[d] the authority to require the franchisee to adhere to the 'McDonald's system,' to adopt and use McDonald's business manuals, and to follow other general guidelines outlined by McDonald's." Id. The court concluded, "McDonald's authority is no more than the authority to insure 'the uniformity and standardization of products and services offered by a [franchisor's] restaurant." Id. (alteration in original) (quoting Little v. Howard Johnson Co., 183 Mich.App. 675, 455 N.W.2d 390, 394 (1990) ).
Defendants argue that in the present case, as in Hoffnagle, the license agreement between the franchisor and the franchisee governed their relationship and the license agreement obligated the franchisee to follow certain brand standards. Defendants point out that many of the same requirements contained in the licensing agreement in Hoffnagle are in the FLA in this case: franchisee was required to use the business manuals created by the franchisor; managerial employees were required to attend the franchisor's brand training; the franchisor had the right to inspect the premises to ensure compliance with the brand standards and policies; and if the franchisee was not in compliance, the franchisor had the right to terminate the license agreement. Defendants posit that despite the brand requirements imposed by the franchisor, the Hoffnagle court held that the franchisee, and not the franchisor, retained control over the daily operations of the business, evidenced by the fact that the franchisee owned the business equipment, operated the business, held the licenses and permits, set employee wages, provided training for its employees, provided insurance for employees, and made the employment decisions. Hoffnagle, 522 N.W.2d at 814. Defendants note that Iowa courts have extended the Hoffnagle retained control standard in similarly affirming summary judgment in favor of a convenience store licensor in a slip-and-fall case, see Miller v. Casey's General Stores, Inc., 711 N.W.2d 733, 2006 WL 128790, at *3 (Iowa Ct. App. Jan. 19, 2006) (unpublished table decision), and in favor of an out-of-possession landowner-lessor, where *697 the lessee's employee was injured on the property, see Van Essen v. McCormick Enterprises Co., 599 N.W.2d 716, 720 (Iowa 1999).
b. Retained Control Test
Defendants rely exclusively on Hoffnagle, arguing the retained control test applies in determining what, if any, duty Hilton and Atrium owed Marchionda. The Hoffnagle retained control test applies to Hilton, the franchisor, but it does not apply to Atrium, the franchisee/hotel owner.
Here, as in Hoffnagle, the franchisor, Hilton, required the franchisee, Atrium, to use business manuals Hilton created (Brand Standards); Hilton required Atrium's managerial employees to attend Hilton's brand training; Hilton had the right to inspect the Hotel premises to ensure compliance with the Brand Standards and policies; and Hilton had the right to terminate the license agreement if Atrium was not in compliance with the Brand Standards. As the Hoffnagle court held, those requirements did not amount to the franchisor retaining day-to-day control of the franchisee. Hoffnagle, 522 N.W.2d at 814. Rather, the franchisee, and not the franchisor, retained control over the daily operations of the business, as evinced by the fact that the franchisee owned the business equipment, operated the business, held the licenses and permits, set employee wages, provided training for its employees, provided insurance for employees, and made the employment decisions. Id. In this case, like the franchisor in Hoffnagle, Hilton did not have the requisite day-to-day control to render it a possessor of land, and therefore did not owe Marchionda a special duty of care. Cf. Order at 3, Andrews v. Marriott Int'l Inc., Case No. 11C-4831 (1st Cir. Ct. Davidson Cty., Tenn. Jan. 29, 2016) (distinguishing the relative duties of the hotel franchisor Marriott, from the duties of the hotel owner/franchisee and the management company, and concluding Marriott did not have the requisite control over the hotel and therefore did not owe the plaintiff a duty of care); Little, 455 N.W.2d at 394 (reasoning neither franchisor's retained right to regulate building construction, furnishings, equipment, and advertising; nor its right to conduct inspections and to hold the franchisee in breach of the franchise agreement for any deviation, provided the franchisor the power to control the details of the restaurant's day-to-day operations).
c. Ostensible Agency
Citing Wilkins v. Marshalltown Med. & Surg. Ctr., 758 N.W.2d 232, 236-37 (Iowa 2008), and Wolbers v. The Finley Hosp., 673 N.W.2d 728, 734 (Iowa 2003), Marchionda argues Hammons and its employees were apparent or ostensible agents of Hilton, and therefore Hilton is liable under an ostensible agency theory.
The Restatement (Second) Torts § 429 defines the doctrine of ostensible agency:
One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.
Restatement (Second) of Torts § 429 (Am. Law Inst. 1965). Wilkins and Wolbers were both medical malpractice lawsuits and in both cases, the courts found the hospitals were vicariously liable for the acts of emergency room doctors, even though the doctors were independent contractors and not employees of the hospitals See Wilkins, 758 N.W.2d at 236-37 (holding that the *698 hospital was vicariously liable under an ostensible agency theory for the negligence of the emergency room doctor where the hospital held itself out to the public as maintaining a 24-hour emergency room, took no affirmative steps to prevent the natural assumption that the emergency room doctors were employees, and billed the patients for the doctor's emergency room services); Wolbers, 673 N.W.2d at 734 (holding the hospital vicariously liable for the negligence of the emergency room caregivers, even though the caregivers were designated independent contractors rather than employees because "an emergency-room patient looks to the hospital for care, and not to the individual physician" (quoting 40A Am. Jur. 2d Hospitals & Asylums § 48, at 460 (1999) ) ).
The hotel franchisor-franchisee relationship in the present case does not create the type of inference of an agency relationship that was created by the hospital-doctor relationships in Wilkins and Wolbers. In this case, neither the Hotel nor Atrium held itself out to be an agent of Hilton. Indeed, the FLA disclaimed any agency relationship between Atrium and Embassy Suites. See FLA ¶ 15.a., Defs.' App. 57, ECF No. 213-2. In addition, Atrium was required to post signage identifying itself as an independent company and not part of Embassy Suites. See FLA ¶ 15.b., Defs.' App. 57, ECF No. 213-2. The relationship between Hilton and Atrium as set forth in the FLA and detailed above, see supra Part I.A.1.a., did not give rise to an ostensible agency relationship. Other courts having considered ostensible or vicarious agency of a hotel franchisor to its franchisee's guest under similar facts have reached the same conclusion. See, e.g., Bright v. Sandstone Hosp., LLC, 327 Ga.App. 157, 755 S.E.2d 899, 902 (2014) (displaying signs or the franchisor's trademark, failing to post a sign stating that someone other than the franchisor owns and operates a business, and plaintiff's belief that an agency relationship exists are insufficient to establish an ostensible agency relationship); Allen v. Greenville Hotel Partners, Inc., No. C A 604-1260-HMH, 2007 WL 1075142, at *1 (D.S.C. Apr. 4, 2007) ("[V]iewing the evidence of [the Hotel Brand]'s role at the [Subject Hotel], including the Agreement, the [Subject Hotel] Rules and Regulations Instructions ..., and [the Hotel Brand]'s interaction with the [Subject Hotel] pursuant to the Agreement, the court finds that the relationship [is] not unlike typical franchisor-franchisee relationships," and therefore, "[the Hotel Brand] could not be liable under either a theory of direct or vicarious liability in negligence" (seventh alteration in original) (internal citation and quotation marks omitted) ); Little, 455 N.W.2d at 394 (holding plaintiff failed to provide any evidence that she was harmed as a result of relying on the perceived fact that the franchisee was an agent of the franchisor).
d. Failure to Train
Marchionda also argues Defendants can be held liable for failure to train and supervise Hammons' employees. Liability on a failure to train and/or supervise theory presupposes a servant or an agency relationship. See Restatement (Second) of Agency § 213 & comment c (providing the principal or master may be negligent for failing to use due care in directing its agent or servant). Because no agency or employment relationship existed, Hilton cannot be liable on a failure to train/supervise theory.
2. Atrium.
a. Franchisee/Owner
Marchionda argues that Atrium is directly liable as the owner of the Hotel and as such owed her a non-delegable duty of reasonable care. In relying almost exclusively on the Hoffnagle retained-control *699 test, Defendants ignore that as Hilton's franchisee, Atrium's role does not align with that of McDonald's-the franchisor in Hoffnagle-but instead with the roles of the franchisees/owners-Rapid-Mac, Inc. and the Mrozinskis-who possessed the land.
The FLA required Atrium to operate the Hotel in compliance with the Brand Standards, to maintain legal possession and control of the Hotel, to maintain insurance for the Hotel, to be responsible for the staff and management of the Hotel, and to obtain and maintain the Hotel's alcohol license. Moreover, Atrium agreed to indemnify Embassy from "all losses, costs, liabilities, damages, claims, and expenses ... arising out of or resulting from ... any bodily injury, personal injury, death or property damages suffered or claimed by any guest, customer, visitor, or employee of the Hotel." FLA ¶ 9, Defs.' App. 46, ECF No. 213-2. Even though the management company was required to be given the authority to perform all Atrium's obligations under the FLA, the MSA between Hammons and Atrium did not relinquish Atrium's responsibilities as Hotel owner and franchisee to Embassy Suites. In addition, the FLA provided that if any conflict arose between the terms of the FLA and terms of MSA, the FLA prevailed. For these reasons, Defendants' assertion that under Hoffnagle neither Hilton nor Atrium owed Marchionda a duty is untenable. The retained control test juxtaposes Hilton as franchisor with Atrium as franchisee. To determine whether a duty existed, the Hoffnagle court applied the retained control test and concluded the franchisor was not responsible for the day-to-day operation of the restaurant, but the franchisee did owe a duty to the plaintiff. Hoffnagle, 522 N.W.2d at 814-15 ("The franchisee, the Mrozinskis, rather than the franchisor, McDonald's, has the power to control the details of the restaurant's day-to-day operation.... [T]he actions or inactions of the employee come under the day-to-day control of the franchisee.").[8] Moreover, Atrium and Hammons did not have a franchisor-franchisee relationship as did Embassy Suites and Atrium.
Atrium was not a franchisor, see Hoffnagle, 522 N.W.2d at 813, nor an absentee owner, see Van Essen, 599 N.W.2d at 721. For purposes of duty of care, Atrium was an innkeeper, whose duties as such are set forth in Benninghoven v. Hawkeye Hotels, Inc., 902 N.W.2d at *1-4.
b. Innkeeper Relationship
In Benninghoven, two hotel guests were assaulted by an off-duty hotel employee. Id. at *1-2. The guests sued the hotel owner and the hotel management company on claims of negligence and negligent hiring. Id. at *2. The defendants moved for summary judgment, asserting neither owed a duty to the plaintiffs for intentional torts committed off property by an off-duty employee. Id.
Looking to Restatement (Second) of Torts § 314A, the court held that "[a] hotel is under a duty to its guests to protect them from unreasonable risk of physical harm." Id. at *4 (citing Restatement (Second) of Torts § 314A (Am. Law Inst. 1965) ). The court reasoned that the special *700 relation duty extended "to risks arising ... from the acts of third persons, whether they be innocent, negligent, intentional, or even criminal." Id. (quoting § 314A, cmt. d and citing Restatement (Third) of Torts § 40 (Am. Law Inst. 2012) (noting "an innkeeper with its guests" is a special relationship imposing upon the innkeeper "a duty of reasonable care with regard to risks that arise within the scope of the relationship"). Id. at *4 (alterations in original).
In defining that special relationship, the Benninghoven court noted:
The liability of an innkeeper for injuries sustained by guests on the innkeeper's premises is governed by the same rules which govern other owners and occupiers of land. Generally, the innkeeper is bound to exercise reasonable care toward guests although some jurisdictions may require a higher standard of care toward guests....
It must also be established that the innkeeper's breach of duty was a proximate cause of the plaintiff's injury.
In addition to exercising reasonable care to see that the premises are maintained in a reasonably safe condition, with regard to guests, the innkeeper also has a duty to protect a guest from the actions of third parties, including other guests and strangers where it is within the innkeeper's power or that of the innkeeper's servants to do so. The relationship between innkeeper and guest is considered a special relationship which gives rise to such a duty. The innkeeper may be liable for assaults of third parties upon guests where the innkeeper has reason to anticipate the assault but fails to exercise reasonable care to prevent it. However, the innkeeper is not an insurer of the invitee's safety. The same standard of care is owed by the innkeeper to the guest's own guests and invitees.
Id. at *5 (emphasis added) (quoting Barry A. Lindahl, 1 Modern Tort Law: Liability and Litigation § 3:50 (2d ed. June 2016) ). The court then considered three factors to determine whether a duty to exercise reasonable care existed: "the relationship between the parties, the foreseeability of harm, and public policy." Id. (quoting McCormick, 819 N.W.2d at 371 ). The factors are not viewed "as 'three distinct and necessary elements, but rather as considerations employed in a balancing process.' " Id. at *6 (quoting Thompson, 774 N.W.2d at 832 ). "Ultimately, 'whether a duty exists is a policy decision based upon all relevant considerations that guide us to conclude a particular person is entitled to be protected from a particular type of harm.' " Id. (quoting Thompson, 774 N.W.2d at 832 ). Under the facts of that case, the Benninghoven court concluded that "[b]ecause the liability imposed upon the innkeeper assumes the ability to proactively prevent an assault on the guest, ... as a matter of law the defendants here cannot be held liable for injuries to guests that occurred off premises by an off-duty employee." Id. at *6 (emphasis added) (internal citation and quotation marks omitted).
The relationship between Atrium and Marchionda was that of innkeeper and guest. The duty that arises out of that relationship "does not make the [innkeeper] an insurer." Tenney v. Atl. Assocs., 594 N.W.2d 11, 17 (Iowa 1999).
The duty in each case is only one to exercise reasonable care under the circumstances. The defendant is not liable where he neither knows nor should know of the unreasonable risk, or of the illness or injury. He is not required to take precautions against a sudden attack from a third person which he has no *701 reason to anticipate, or to give aid to one whom he has no reason to know to be ill. He is not required to take any action where the risk does not appear to be an unreasonable one ....
Id. at 17-18 (quoting Restatement (Second) of Torts § 314A cmt. e). Although Marchionda "must eventually establish that the risk of harm by a third party was reasonably foreseeable to [Atrium] in order to establish a duty," at the summary judgment stage, "the specific question is whether the [Atrium] showed the absence of a genuine issue of fact on foreseeability." Id. at 18. The Court finds that in resistance to summary judgment, Marchionda has "presented evidence generating a genuine issue of fact on foreseeability." Id. There is repeated testimony that there was no oversight of the room key policy; and Morrissey's testimony that he had no knowledge whether anyone actually reviewed the key control policy, his concession that the key policy was "an informal policy," and his affirmation that no one "at Hammons ever made any effort to review all of the policies and procedures on key control at each of the hotels that Hammons manages." Morrissey Dep. 136, Pl.'s App. 79, ECF No. 238-4. However, the fact that a room key was given by a Hotel employee to an obviously intoxicated Hotel guest without requiring any identification, followed minutes later by assisting the same guest in disabling the guest room's safety latch, again without asking the guest for identification, clearly generates a genuine issue of fact on foreseeability that harm would come to Marchionda as a result. Tenney, 594 N.W.2d at 21 ("[O]bviously the defendant cannot be relieved from liability by the fact that the risk, or a substantial or important part of the risk, to which the defendant has subjected the plaintiff has indeed come to pass. Foreseeable intervening forces are within the scope of the original risk, and hence of the defendant's negligence. The courts are quite generally agreed that intervening causes which fall fairly in this category will not supersede the defendant's responsibility." (quoting Prosser & Keeton § 44, at 303-04) ).
The Court concludes that Defendants Embassy Suites Franchise, LLC; Hilton Worldwide Holdings, Inc.; and Hilton Worldwide, Inc. did not owe Marchionda a duty of care, and must be dismissed. The Court further concludes Atrium TRS III, LP, as owner of the Hotel, owed Marchionda a duty of care, and there is a genuine issue of fact as to whether Atrium breached that duty. See, e.g., Westin Operator, LLC v. Groh, 347 P.3d 606, 613 (Colo. 2015) (reversing the trial court's grant of summary judgment in favor of the defendant hotel, reasoning under Restatement (Second) of Torts § 314A, the hotel was an innkeeper that owed a duty to exercise reasonable care towards its guests and a fact question remained whether the hotel breached that duty by evicting the intoxicated guest into a foreseeably dangerous environment).
C. Punitive Damages
Defendants also move for summary judgment against Marchionda's claim for punitive damages, Count II. Having dismissed the four Hilton Defendants, Count II only applies to Atrium and Hammons. Defendants argue that no reasonable fact finder could find by a preponderance of clear, convincing, and satisfactory evidence that Defendants' alleged conduct on which Plaintiff's claim is based constituted malicious conduct that could give rise to punitive damages against Defendants. Defendants argue that given the nature of the allegations against Defendants as well as against non-party LaPointe, permitting the jury to consider punitive damages would be extremely prejudicial to Defendants.
*702 Plaintiff resists, arguing Defendants' conduct was willful, wanton, and outrageous and demonstrated a complete and thorough reckless indifference to her rights, health, and safety.
1. Iowa's Legal Standard for Punitive Damages
The standard for awarding punitive damages in Iowa is found in Iowa Code § 668A.1(1)(a), (b), which provides:
(a) Whether, by a preponderance of clear, convincing, and satisfactory evidence, the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another.
(b) Whether the conduct of the defendant was directed specifically at the claimant, or at the person from which the claimant's claim is derived.
The Iowa Supreme Court has defined "willful and wanton" as used in the statute to mean, "[t]he actor has intentionally done an act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences." McClure v. Walgreen Co., 613 N.W.2d 225, 230 (Iowa 2000) (quoting Fell v. Kewanee Farm Equip. Co., 457 N.W.2d 911, 919 (Iowa 1990) ). "[P]unitive or exemplary damages serve three purposes: (1) punishment, (2) specific deterrence, and (3) general deterrence." In re Vajgrt, 801 N.W.2d 570, 575 (Iowa 2011). "Consequently, punitive damages are appropriate only when actual or legal malice is shown. Mere negligent conduct is therefore not sufficient to support a claim for punitive damages." Mercer v. Pittway Corp., 616 N.W.2d 602, 617 (Iowa 2000) (citations omitted). "Actual malice is characterized by such factors as personal spite, hatred, or ill will. Legal malice is shown by wrongful conduct committed or continued with a willful or reckless disregard for another's rights." McClure, 613 N.W.2d at 231.
a. Atrium
Defendants argue Marchionda cannot prove sufficient conduct attributable to Atrium to give rise to punitive damages. Defendants point out that Atrium did not employ any of the employees who were involved in the actions that led to LaPointe obtaining access to Plaintiff's room; no employees were agents of Atrium; all employees were employed, controlled, and managed by Hammons; Atrium did not develop or have a role in drafting or implementing the key control policy of Hammons and did not train any Hammons employees or managers regarding the key control policy or other safety policies; Atrium was unaware of any other incidents similar to the conduct at issue in this litigation occurring at the Hotel and had no knowledge of the potential for such conduct to occur at the Hotel. For these reasons, Defendants argue there is no evidence in the record to support an award of punitive damages, and Count II must be dismissed against Atrium as a matter of law.
None of the cases cited by Defendants involved the grant of summary judgment on punitive damage claims in negligence cases; rather, each case cited where the court held punitive damages were not supported involved either a decision not to submit punitive damages for jury consideration, a directed verdict, or judgment notwithstanding the verdict. See Cawthorn v. Catholic Health Initiatives Iowa Corp., 743 N.W.2d 525, 529-30 (Iowa 2008) (affirming the district court's ruling denying submission of punitive damages to the jury, reasoning admissible evidence at trial did not *703 support a claim that the defendant hospital had intentionally committed "an act of such unreasonable character as to make it highly probable that harm would follow or that [the hospital]'s actions were accompanied by a conscious indifference to the consequences"); Kuta v. Newberg, 600 N.W.2d 280, 288 (Iowa 1999) (affirming the district court's grant of a directed verdict against plaintiff's punitive damages claim, reasoning the evidence presented at trial did not meet the test for punitive damages); Briner v. Hyslop, 337 N.W.2d 858, 871 (Iowa 1983) (granting a post-trial motion for judgment notwithstanding the verdict on punitive damage award against the defendant truck owner, but denying the motion as to the punitive damage award against the defendant truck driver who caused the motor vehicle accident that resulted in plaintiff's death).
Defendants suggest the case in which courts have allowed punitive damages claims to go to the jury involved more egregious facts than does the present case. See, e.g., Wolf v. Wolf, 690 N.W.2d 887, 893-94 (Iowa 2005) (holding "clear, convincing, and satisfactory evidence support[ed] the district court's finding of willful and wanton conduct warranting punitive damages" in a child custody case, where the defendant's conduct including keeping the child away from her father for nearly three years, providing the child the means to run away, and disobeying court orders by taking the child out of state); McClure, 613 N.W.2d at 231 (holding that it was for the jury to decide whether the pharmacy had willful and wanton disregard for rights and safety of its customer, so as to warrant punitive damages award where evidence admitted at trial was not simply "one innocent misfill" of a prescription, but showed thirty-four incident reports within three-years of the incident in question); Becker v. Longinaker, 784 N.W.2d 202 (Iowa Ct. App. April 21, 2010) (permitting punitive damages against a bank and its CEO after they intentionally trespassed on the land of a debtor's neighbor and seized the debtor's neighbor's horses to satisfy a note that had previously been cancelled, and failed to return the horses when notified the property did not belong to the debtor); Riggan v. Glass, 734 N.W.2d 486 (Iowa Ct. App. 2007) (upholding punitive damages against bank when the bank hindered, delayed, obstructed, and misled a customer in the customer's effort to discovery funds embezzled by the bank).
On the current record, Marchionda has presented a submissible case on the issue of Atrium's liability. Thus, viewing the facts in the light most favorable to Marchionda, the Court cannot dismiss the punitive damages claim as a matter of law, but will evaluate the submissibility of the claim after Marchionda presents her evidence at trial. Cf. Van Der Weide v. Cincinnati Ins. Co., No. C14-4100-LTS, 2017 WL 2837016, at *9 (N.D. Iowa June 30, 2017) (denying summary judgement on defendant's punitive damages claim where plaintiff had presented a submissible bad faith claim, reasoning dismissal as a matter of law was inappropriate and the claim would be reevaluated after plaintiff presented her evidence at trial).
b. Hammons
Defendants next argue that the allegations against Hammons do not rise to the level required to submit the issue of punitive damages against Hammons to the jury. Defendants argue the allegations primarily relate to conduct of individual Hammons' employees, rather than conduct by the entity itself. Defendants point out that it was Libby Hennings who negligently authorized the front desk clerk to provide LaPointe a key to Plaintiff's room without verifying his identity. Hennings did not *704 know that LaPointe had asked for a key to a room for which he was not registered. Plaintiff further alleges maintenance employee Caligiuri negligently used a tool to disengage the night latch on the door to allow LaPointe to access Plaintiff's room. Defendants proffer that Hammons did not authorize these acts done by its employees here, it had a key control policy in effect, and the issuance of the key without checking for identification was a violation of that key control policy. For this reason, Defendants assert this conduct simply does not rise to the level of willful or wanton conduct to impute liability for punitive damages against Hammons.
Defendants did not move for summary judgment on Count I, as it relates to Hammons' duty to Marchionda. Recognizing, as it must, that a duty exists, the issues of breach, causation, and damages remain for the jury to decide. See McCormick, 819 N.W.2d at 371. For the same reasons stated as to Atrium, viewing the facts in the light most favorable to Marchionda, the Court cannot dismiss the punitive damages claim as a matter of law, but will evaluate the submissibility of the claim after Marchionda presents her evidence at trial. Cf. Van Der Weide, 2017 WL 2837016, at *9.
III. CONCLUSION
For the reasons set forth above, Defendants' Motion for Summary Judgment, ECF No. 212, is granted in part, and denied in part . The motion is granted as to Defendants Embassy Suites Franchise, LLC, Hilton Worldwide Holdings, Inc., and Hilton Worldwide, Inc. on Count One; denied as to Defendant Atrium TRS III, LP on Count One; and denied as to both Defendants Atrium TRS III, LP and John Q. Hammons Hotels Management, LLC on Count Two. Embassy Suites Franchise, LLC, Hilton Worldwide Holdings, Inc., and Hilton Worldwide, Inc. are dismissed from this action.
IT IS SO ORDERED.

In this Order, the Court refers to the relationships between the Defendants as they existed at the time relevant to this case.

Hilton's designated representative, Alan Roberts, attested that Atrium Finance III, LP (Atrium Finance) owned the property where the Hotel is located. Atrium TRS III, LP leases the property from Atrium Finance.
Schedule 1 to the FLA shows that the sole member of Atrium TRS III, LP is Atrium Holdco TRS GP, LLC, whose sole member is Atrium TRS Holdings, LLC. Schedule 2 to the FLA likewise shows that the sole member of Atrium Finance is Atrium TRS Holdings, LLC.

Marchionda adds, however, that the Hilton-authored Brand Standards consisted of policies and procedures specific to certain day-to-day operations of the Hotel, which the Hotel was required to adopt. Those included implementing a "Manager-on-Duty" program, a "Make it Right commitment" used to train and motivate hotel staff to promote guest satisfaction, telephone etiquette standards, and the "Customer Really Matters" program.

Roberts denied that Hilton had the authority to terminate the Hotel's management company and/or general manager or that Hilton had such a right. Roberts stated that Hilton only had "a right to raise the issue with the ownership group if [Hilton] ha[d] a concern about it, but ultimately that decision would fall upon the ownership group." Roberts' Dep. 37-38, Pl.'s App. 25-26, ECF 238-4. Thus, if Hilton informed the Hotel that Hammons or the general manager was unacceptable to Hilton and Atrium failed to retain an acceptable replacement within 90 days, Hilton had the right to terminate the FLA.

In "quoting" Hammons' responsibilities stated in the MSA, Hilton selectively omits key words that describe Atrium's rights, control, and oversight of Hotel operations.

Hammons, Inc. was also named as a Defendant, but was voluntarily dismissed on February 22, 2016.

As previously identified, the Court refers to HW, HWH, and Embassy Suites as Hilton.

In Hoffnagle, the plaintiff sought relief under Iowa's workers' compensation statute, Iowa Code § 85, which provides an exclusive remedy, precluding the plaintiff/employee from suing her employers. See Spencer v. Annett Holdings, Inc., 757 F.3d 790, 795 (8th Cir. 2014) ("Under Iowa law, however, the 'rights and remedies' under the workers' compensation statutes are 'the exclusive and only rights and remedies of the employee ... [a]gainst the employee's employer.' " (quoting Good v. Tyson Foods, Inc., 756 N.W.2d 42, 45 (Iowa Ct. App. 2008) ) ).